# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NORTHWESTERN UNIVERSITY,

    *Plaintiff,*

  v.

UNIVERSAL ROBOTS A/S, and
UNIVERSAL ROBOTS USA, INC.

    *Defendants*.

C.A. No. 21-149-CFC

## OPENING BRIEF IN SUPPORT OF
## UNIVERSAL ROBOTS A/S AND UNIVERSAL ROBOTS USA, INC.'S
## MOTION TO DISMISS NORTHWESTERN UNIVERSITY'S COMPLAINT

Of Counsel:

Vinita Ferrera
James M. Lyons
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Christopher R. Noyes
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

Dated:  May 27, 2021

Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

*Counsel for Defendants Universal
Robots A/S and Universal Robots USA,
Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

I.      NATURE AND STAGE OF THE PROCEEDINGS ......................................1

II.     SUMMARY OF THE ARGUMENT ............................................................1

III.    STATEMENT OF FACTS ...........................................................................2

        A.      The Alleged Problem Identified By The Asserted Patents ..................2

        B.      The Alleged Solution Identified In The Asserted Patents....................3

        C.      The Asserted Claims ...........................................................................6

        D.      The Accused Products .........................................................................8

IV.     ARGUMENT ..............................................................................................9

        A.      NU's Claims Should Be Dismissed Because The Asserted
                Patents Are Patent Ineligible Under § 101. ..........................................9

                1.      Alice Step 1: The Asserted Patents Are Directed To The
                        Abstract Idea Of Networking Together Existing Payload
                        Carriers. ..................................................................................10

                2.      Alice Step 2: The Patent Claims Lack An Inventive
                        Concept. ..................................................................................14

                        a.      The Claims Of The '336 Patent Lack An Inventive
                                Concept. ......................................................................15

                        b.      The Claims Of The '317 Patent Lack An Inventive
                                Concept. ......................................................................17

                        c.      The Claims Of The '508 Patent Lack An Inventive
                                Concept. ......................................................................18

        B.      NU's Contributory Infringement Claims Rely On Boilerplate
                Recitations Of The Legal Standard And Should Be Dismissed. ........21

        C.      NU Has Not Pled Compliance With The Marking Requirement
                In § 287(a) Of The Patent Act.............................................................22

V.      CONCLUSION.........................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014).................................................................................9, 10, 18

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017) ..........................................................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................21

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
   687 F.3d 1266 (Fed. Cir. 2012) ..........................................................................16

*Bilski v. Kappos*,
   561 U.S. 593 (2010)........................................................................................9, 14

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
   778 F. App'x 882 (Fed. Cir. 2019) ......................................................................16

*Enco Sys., Inc. v. DaVincia, LLC*,
   2021 WL 855856 (Fed. Cir. Mar. 8, 2021).........................................................10

*Express Mobile, Inc. v. Liquid Web, LLC*,
   No. 18-1177-RGA, 2019 WL 1596999 (D. Del. 2019).......................................23

*Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*,
   No. CV 17-1086-LPS, 2018 WL 5669168 (D. Del. Nov. 1, 2018)......................23

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) ..........................................................................13

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
   No. CV 18-452-WCB, 2019 WL 330515 (D. Del. Jan. 25, 2019) ......................21

*Malvern Panalytical, Inc. v. TA Instruments-Waters*,
   LLC, No. CV 19-2157-RGA, 2020 WL 8225650 (D. Del. May 5,
   2020) ...................................................................................................................22

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
　　566 U.S. 66 (2012) ........................................................................9, 18

*Tonal Sys., Inc. v. Icon Health & Fitness, Inc.*,
　　No. CV 20-1197-LPS, 2021 WL 1785072 (D. Del. May 5, 2021) ...................22

*Trading Techs. Int'l v. IBG LLC*,
　　921 F.3d 1084 (Fed. Cir. 2019) ............................................15, 17, 19

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*,
　　916 F.3d 1363 (Fed. Cir. 2019) ........................................................10

*Valmont Industries, Inc. v. Lindsay Corp.*,
　　2018 WL 5962469 (D. Del. Nov. 14, 2018)..........................................19, 20, 21

**Federal Statutes**

35 U.S.C. § 101 .........................................................................*passim*

35 U.S.C. § 271(c) ..........................................................................22

35 U.S.C. § 287(a) ........................................................................2, 23

**Regulations**

37 C.F.R. 1.75(c)............................................................................14

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ..........................................1, 21

## I.   NATURE AND STAGE OF THE PROCEEDINGS

On February 4, 2021, Northwestern University ("NU") filed these cases against Universal Robots A/S and Universal Robots USA, Inc. (together, "Universal Robots" or "Defendants"), alleging that Defendants infringe U.S. Patent Nos. 6,907,317 (the "'317 patent"), 6,928,336 (the "'336 patent"), and 7,120,508 (the "'508 patent") (collectively, the "Asserted Patents").   NU has asserted claims of direct, induced, contributory, and willful infringement for each of the Asserted Patents.

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) because the Asserted Patents are not drawn to patent-eligible subject matter under 35 U.S.C. § 101, and because NU's complaint otherwise fails to plead factual allegations sufficient to support its claims.[1]

## II.   SUMMARY OF THE ARGUMENT

1.   The claims of the Asserted Patents are directed to abstract ideas and lack inventive concepts sufficient to render them patent eligible under 35 U.S.C. § 101.

---

[1] A parallel case was filed by NU against ABB, Ltd. and ABB, Inc. (together "ABB"), asserting the same patents.  C.A. No. 1:21-cv-00150-CFC.  Universal Robots and ABB have filed motions with substantively identical briefs with respect to patent ineligibility and marking.  In those sections, the differences between the briefing relates to party-specific information and record cites.

2.     NU's claim for contributory infringement is merely a boilerplate recitation of the legal standard.

3.     NU has not pled compliance with the marking requirement in § 287(a) of the Patent Act.

## III.   STATEMENT OF FACTS

The Asserted Patents share a specification, and all relate to the networking of existing industrial automation devices together for moving payloads.[2]

### A.     The Alleged Problem Identified By The Asserted Patents

The specification of the Asserted Patents explains that in industrial settings, such as assembly lines, there is often a need to move large payloads.  '336 patent, 1:16-19.  If a payload is too large, a human operator may need mechanical assistance to move it.  *Id.*  Accordingly, "a great deal of industrial assembly and material handling work is done with the help of assist devices such as x-y overhead rail systems."  *Id.* at 1:21-23.  These overhead rail systems can function passively by supporting the load and providing a path for its movement, *id.* at 1:29-34, or actively by using motors or hydraulics to generate additional force to assist in moving the payload, *id.* at 1:55-62.

---

[2] Unless discussing specific patents, citations are to the '336 patent, but also apply to the '317 and '508 patents, which share a common specification.

The specification further explains that "Intelligent Assist Devices" ("IADs") are a class of machines that can "interact with a human operator to assist in moving a payload." *Id.* at 1:63-65. IADs are the subject of a standard set by the Robotics Industry Association, which defines an IAD as "a single or multiple axis device that employs a hybrid programmable computer-human control system to provide human strength amplification, guiding surfaces, or both." *Id.* at 2:3-8.

The Asserted Patents state that at the time of the alleged invention there was a need "to connect and integrate a number of IAD components to work together, and a computer interface design that allows [a] technician or system integrator to easily program, operate and monitor the status of an IAD system made up of a plurality of components." *Id.* at 2:52-57.

### B.     The Alleged Solution Identified In The Asserted Patents

The patents acknowledge that the claimed systems "are implemented on an overhead rail system of a ***known type***." *Id.* at 6:26-27 (emphasis added). The overhead rail systems provide support for moving payloads throughout factories using "modules," such as trolleys and lifts. *Id.* at 6:53-7:17. The Detailed Description of the alleged invention discloses an "interconnection of modules such as a trolley **101**, lift **103**, sensor **107**, hub **105**, intent sensor **109**, and user tooling

**111** via computational nodes **102**, **104**, and **106**," as shown in Figure 1.  *Id.* at 6:39-

42.[3]



*FIG. 1*

The specification confirms that computational nodes **102**, **104**, and **106**

include generic computer chips—such as Intel Pentium CPU chips—which can be

---

[3] Annotated (yellow) to show the networking of modules via standard computational
nodes.  *See* '336 patent, 8:11-25, 18:23-25.

placed on different modules.  *Id.* at 8:11-25, 18:23-25.  The nodes are networked together using standard networking techniques, such as the "Controller Area Network (CAN) protocol, described in ISO standard 11898" or the well-known "Ethernet protocol."  *Id.* at 7:34-42.

The claimed systems also contain a communications hub **105** that can be made from off-the-shelf computer components*, see id*. at 8:51-60, and a graphical user interface ("GUI") on a conventional "user-supplied" computer **110**, that allows for configuration of the systems, *id*. at 14:42-49.

The specification makes clear that none of the components are "related or limited to any particular type of … network system (hardware or software), unless indicated otherwise."  *Id.* at 19:1-5.  Instead, "***[v]arious types of general purpose*** or specialized ***systems may be used*** with or perform operations in accordance with the teachings described herein."  *Id.* at 19:5-8 (emphasis added).  As such, the Asserted Patents merely describe networking existing hardware, such as trolleys and lifts, with general purpose computer systems by adding a "hub," "computational nodes," and a GUI to such hardware.

### C.  The Asserted Claims

The Asserted Patents focus on different aspects of the disclosed systems.

Claim 1 of the '336 patent—the only claim identified in NU's Complaint[4]—recites:

> 1. [pre] An intelligent assist system having a modular architecture, comprising:
>
>> [A] a **motion module** for supporting and moving a payload;
>>
>> [B] a plurality of **computational nodes**, at least one of the plurality of computational nodes being configured to control the motion module;
>>
>> [C] and a plurality of **communication links**, at least one of the plurality of communication links being between two of the plurality of computational nodes to carry information between the nodes to actuate the motion module.

Claim 1—the only independent claim of the '317 patent and the only claim identified in NU's Complaint—recites[5]:

> 1. [pre] A **multi-function hub** for use in an intelligent assist system, the multi-function hub comprising:
>
>> [A] a **physical interface** configured and arranged to be a central interface point for an operator;

---

[4] The only other independent claim, claim 27, largely recites the same limitations, with the added requirement that the system be constructed using an "overhead support," which the patent describes as "of a known type." *E.g.*, '336 patent, 6:26-27.

[5] NU's recitation of claim 1 in its Complaint omits the critical claim limitation requiring "at least one other module within the intelligent assist system wherein the I/O interface communicates with the computational node." D.I. 1 ¶ 73. This is an independent basis to dismiss NU's claim.

[B] a **computational node** disposed on the physical interface, the computational node comprising programmable logic for implementing program controlled functions, and

[C] **an input/output ("I/O") interface** for interfacing with an information network and disposed on the physical interface, the I/O interface being adapted to communicate with the computational node on the physical interface and at least one computational node disposed on at least one other module within the intelligent assist system wherein the I/O interface communicates with the computational node disposed on the other module via a common data link, and the I/O interface uses a digital communication protocol to communicate with the computational node on the other module via the common data link.

Claim 1 of the '508 patent—the only independent claim and the only claim identified in NU's Complaint—recites:

1. [pre] A configuration system for an intelligent assist system, the intelligent assist system comprising a **module**, and a computational node on the module, the configuration system comprising:

[A] a **host computer system** capable of executing a stored program, the host computer system being in communication with the computational node via a communication link;

[B] a **graphical user interface** enabling a user to manipulate objects related to the module or the computational node; and

[C] a plurality of **visual indicators** corresponding to a status of the module, the computational node, or the communication link.

7

As the common specification acknowledges, the Asserted Patents do not claim any non-conventional components, any specialized way in which the claimed systems assist a human operator or improves control over or communication between the human operator and the device, any new way of indicating a component's status, any novel display technique to enable manipulation of objects, or any new approach to ensuring the safety of the human operator when sharing a workspace with the claimed systems. *See supra* III.B.

### D.    The Accused Products

Universal Robots was founded in 2005 to provide lightweight robotic arms that a non-specialist could easily program to independently perform a task. Unlike the systems described in the Asserted Patents, these relatively small, lightweight devices were not designed to assist a human worker in moving a payload. Rather, they work alongside a human worker performing independent, fully autonomous pre-programmed tasks, such as product assembly and welding.

NU's Complaint identifies seven allegedly infringing product families. *See* D.I. 1 ¶¶ 38-41. Each consists of a lightweight robotic arm used in conjunction with a control box and a teach pendant, which allows for programming of the arm. NU alleges that these products infringe simply because they have a "modular architecture" and are "designed to share a workspace with humans." *Id*. ¶¶ 52, 53.

NU asserts three causes of action, each seeking relief for a variety of claims under each Asserted Patent, including direct, contributory, induced and willful infringement. *Id*. ¶¶ 46-90.

## IV.   ARGUMENT

### A.   NU's Claims Should Be Dismissed Because The Asserted Patents Are Patent Ineligible Under § 101.

It is well established that laws of nature, natural phenomena, and abstract ideas are not patentable. *See, e.g.*, *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012). To determine whether an invention is patent eligible, a court must first consider "whether the claims at issue are directed to one of those patent-ineligible concepts." *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). If so, a court further "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id*. (citation omitted).

The question is whether claims do "significantly more" than simply describe an abstract idea or mental process. *See Mayo*, 566 U.S. at 73. Where claims recite an abstract idea or mental process, and merely add steps or components that are conventional to those in the field, the claims are not patentable. *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010). Likewise, "the mere recitation of a generic computer

cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

1. *Alice Step 1*: **The Asserted Patents Are Directed To The Abstract Idea Of Networking Together Existing Payload Carriers.**

The Asserted Patents relate to the use of conventional technology to network together standard factory equipment, such as trolleys and lifts, to move a payload. Rather than having a foreperson direct trolley and lift operators from across the factory floor, the Asserted Patents describe and claim networking the trolleys and lifts to a central hub that performs the same function. *See supra* III.B.

The claims, at best, simply replace age-old actions of people with generic computer components. Instead of two workers speaking as they move equipment around a factory, the claims replace people with two "computational nodes" that share information through "communication links" to accomplish the same result. The Federal Circuit has repeatedly held that similar claims to "automating work otherwise performed through human labor" are directed to abstract ideas where the claims recite "known computer techniques for automation of known processes." *Enco Sys., Inc. v. DaVincia, LLC*, 2021 WL 855856, at *3 (Fed. Cir. Mar. 8, 2021) (claims to "automating the AV-captioning process" were directed to an abstract idea and ineligible); *accord Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1366-1367 (Fed. Cir. 2019) (claims to "integrating physiologic treatment data" ineligible because they merely took existing human tasks and said "do it on a

computer").  Accordingly, the claims of the Asserted Patents are directed to the abstract idea of communication over a network for interacting with existing systems for moving payloads.

The shared specification makes clear both that the computer techniques recited in the claims were known, standard techniques, and that these techniques were implemented with standard, off-the-shelf components.  The modules are standard factory equipment, such as trolleys, lifts, and cranes that work on an "overhead rail system of a known type," '336 patent, 6:26-27, 6:56-65; the computational nodes are made from generic computer chips, *id.* at 8:11-25, 18:23-25; the network is constructed using standard networking techniques, *id.* at 7:34-42; the communications hub can be made from off-the-shelf computer components, *id.* at 8:51-60, and the GUI runs on a conventional "user-supplied" computer, *id.* at 14:42-49.

As the Federal Circuit explained in *ChargePoint, Inc. v. SemaConnect, Inc.*, where patents simply "add networking capabilities to existing" modules, the "focus of the claim is on the abstract idea of network communication for device interaction."  920 F.3d 759, 770 (Fed. Cir. 2019).  There, the court held that patents claiming the use of control devices, transceivers, and servers to enable or disable electric vehicle charging stations were directed to "the abstract idea of communication over a network for interacting with a device, applied to the context

11

of electric vehicle charging stations." *Id.* at 768. Like the patent ineligible claims at issue in *ChargePoint*, the claims of the Asserted Patents apply the "abstract idea of communication over a network for interacting with a device" to the context of existing systems for moving payloads.

The specification confirms that the claims of the Asserted Patents are directed to an abstract idea. As explained in *ChargePoint*, "[t]he 'directed to' inquiry may also involve looking to the specification to understand 'the problem facing the inventor' and, ultimately, what the patent describes as the invention." *Id.* at 767. Here, the Asserted Patents state that they purportedly address the need to "to connect and integrate a number of IAD components to work together, and a computer interface design that allows [a] technician or system integrator to easily program, operate and monitor the status of an IAD system made up of a plurality of components." '336 patent, 2:52-57. The solution described and claimed by the Asserted Patents is "coordinat[ing] by serial digital communication, to allow ease of configuration to a variety of applications" and to "simplify testing and monitoring of the system to increase ease of operation." *Id.* at 2:67-3:1, 3:10-13. In other words, the Asserted Patents claim the same "abstract idea of communication over a network for interacting with a device" that the Federal Circuit deemed patent ineligible in *ChargePoint*. 920 F.3d at 768; *see* '336 patent, 7:33-42.

To the extent NU suggests that the claims are directed to the "intelligent assist systems" referred to in the preambles of the claims, that does not alter the analysis. Even assuming *arguendo* that the preambles are limiting, every component of the claimed systems were conventional at the time of the purported invention. *See supra* at 11. Using the words "intelligent assist system" to describe well-known techniques using standard components does not transform the claimed abstract idea into something patentable. *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) (applying "coined labels to conventional structures does not make the underlying concept inventive").

Further, NU's contention that the Asserted Patents cover any collaborative robot, or "cobot," "designed to share a workspace with humans," D.I. 1 ¶ 52,[6] does not save the claims. Based on NU's broad interpretation of the Asserted Patents, the claims are directed to yet another patent-ineligible, abstract idea, *i.e.*, humans sharing a workspace with a machine. *See ChargePoint*, 920 F.3d at 771 ("[A]dding one abstract idea ... to another abstract idea ... does not render the claim non-abstract.") (alterations in original).

---

[6] Defendants disagree with NU's suggestion the terms "intelligent assist system" and "intelligent assist device," as used in the Asserted Patents, are coextensive with a class of devices referred to as "cobots." For the purpose of this motion only, however, Defendants accept NU's apparent claim construction as applied in NU's Complaint.

Moreover, as the Supreme Court explained in *Bilski*, "the prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.'"  561 U.S. at 610-11.  The abstract idea of communication with existing systems over a network to move payloads is not rendered patent eligible simply by constraining the idea to use with a particular type of equipment, *i.e.*, intelligent assist systems or such systems that utilize an overhead support, as claimed in independent claim 27 of the '336 patent. *E.g.*, '336 patent, 6:26-27.[7]

Regardless of whether the claims are ultimately construed to cover collaborative robotic arms (referred to by NU as "cobots"), other devices called "cobots" or are limited to so-called "intelligent assist systems," the claims are directed to an unpatentable abstract idea under step one of *Alice*.

### 2.      *Alice Step 2: The Patent Claims Lack An Inventive Concept.*

At step two of the *Alice* analysis, none of the claims add an inventive concept to the unpatentable abstract idea to which the Asserted Patents are directed.  Instead, they merely implement the abstract idea using well-understood, routine, and conventional components and methods.

---

[7] The dependent claims are generally directed to the same subject matter, though more narrowly.  *See* 37 C.F.R. 1.75(c).  None of the additional limitations renders the claimed inventions any less abstract because, as discussed below, they merely add generic limitations to the independent claims.

### a. *The Claims Of The '336 Patent Lack An Inventive Concept.*

Claim 1 of the '336 patent is the only claim identified in NU's Complaint. Limitation 1[A] simply requires a "motion module for supporting and moving a payload." The specification makes clear that the "motion module" in claim 1 includes centuries-old technologies, like trolleys and lifts. *See* '336 patent, 18:7-9.

As alleged in the Complaint, D.I. 1 ¶¶ 56-57, limitations 1[B] and 1[C] are generic tools for receiving and communicating information, and do not make the claims patent eligible. *See Trading Techs. Int'l v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019). Limitation 1[B] broadly requires a "plurality of computational nodes," which the specification explains can be "Intel Pentium CPU[s]" with "additional analog and digital support circuitry." *Id*. at 8:18-20. And, limitation 1[C] broadly requires "a plurality of communication links," which the specification explains can be implemented using conventional networking protocols. *Id.* at 7:34-42. The remaining claims, including independent claim 27, merely add elements that limit the claims to particular versions of these generic embodiments. *E.g.*, claims 2, 3, 28, 29 (requiring the motion module be a "moveable trolley" or "lift"); claims 11-16 (identifying the network for the communications link); claim 27 (requiring an "overhead support").

Merely adding "generic networking capabilities" to existing systems does not provide an inventive concept. *ChargePoint*, 920 F.3d at 774–75; *see also Bancorp*

*Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("[T]he use of a computer in an otherwise patent-ineligible process for no more than its most basic function … fails to circumvent the prohibition against patenting abstract ideas and mental processes.").

The components claimed as part of the '336 patent's "intelligent assist system" do nothing more than perform well-understood, routine, and conventional processes that were well-known in the industry.  The claims do not claim any specialized way in which the "assist" system actually assists a human operator, any particular way in which the "intelligent" system improves control over or communication between the human operator and the device, any new way of indicating a component's status, any novel display technique to enable manipulation of objects, any new approach to ensuring the safety of the human operator when sharing a workspace with the device, or any non-conventional components.  Nor do the conclusory allegations of novelty in NU's Complaint support an inventive concept.  *See Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 894 (Fed. Cir. 2019) (allegations of novelty and of "technical innovations" in the complaint did not create a factual issue on motion to dismiss).  The claims of the '336 patent simply take an abstract idea and say to implement it using conventional means.  Therefore, the claims of the '336 patent are ineligible under § 101, and NU's First Cause of Action should be dismissed.

**b. *The Claims Of The '317 Patent Lack An Inventive Concept.***

None of the limitations in the '317 patent claims add anything significantly more to the abstract idea of communication over a network for interacting with existing systems for moving payloads.  Instead, just like the claims of the '336 patent, they merely recite generic computer components used in a conventional manner.

Claim 1 of the '317 patent is the only claim identified in NU's Complaint. Limitation 1[A] simply requires a "physical interface."  Limitation 1[B] broadly requires a "computational node," which the patent explains can be an "Intel Pentium CPU" with "additional analog and digital support circuitry."  *See* '317 patent, 8:16-18.  And, limitation 1[C] broadly recites an I/O interface.  *Id.* at 19:37-48.  Again, these are generic tools for receiving and communicating information, and do not render the claims patent eligible.  *See, Trading Techs.*, 921 F.3d at 1093.  Claim 1 provides no meaningful restrictions on the nature of the physical interface or the I/O interface.  The dependent claims, likewise, make clear that these elements can comprise any number of well-known components such as "sensors," '317 patent, 19:52-53, "a swivel," *id.* at 20:24-25, or "a wireless data link," *id.* at 20:55-56. Accordingly, the claims of the '317 patent lack an inventive concept sufficient to render them patent eligible.  NU's Second Cause of Action should be dismissed.

### c. *The Claims Of The '508 Patent Lack An Inventive Concept.*

The claims of the '508 patent merely add a generic GUI and other conventional computer components, which do not add "significantly more" to the unpatentable abstract idea of communication over a network for interacting with existing systems for moving payloads. *See Mayo*, 566 U.S. at 73-74.

Claim 1 of the '508 patent is the only claim identified in NU's Complaint. Limitation 1[A] simply requires a generic networked computer. *See* '508 patent, 6:47-48 (describing the "user-supplied...computer"). This is confirmed by dependent claims 11-13 which recite that the host computer system "comprises a laptop computer," "a handheld computer," and a "personal digital assistant." This "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

The remaining limitations simply provide for receiving and displaying information and using a conventional GUI to implement instructions. Limitation 1[B] broadly requires a GUI that allows for the manipulation of "objects" by the user, and limitation 1[C] broadly requires visual status indicators, which are simply means of displaying data. The patent explains that "many … interface conventions, well-known in the art, may be used," and "other graphic interface elements may be implemented by those skilled in the art." '508 patent, 14:52-53, 17:66-18:3. The claims of the '508 patent involve nothing more than using a standard GUI to

manipulate the parameters of a generic module, transmitting those instructions using conventional networking technology, and displaying status information.

The Federal Circuit has held that claims directed to receiving and displaying information and using a conventional GUI to implement an instruction are not patent eligible. *Trading Techs.*, 921 F.3d at 1093 (receiving and displaying information is well-understood, routine, and conventional, and selecting and moving an icon is well-understood, routine, conventional activity). Similarly, in *Valmont Industries, Inc. v. Lindsay Corp.*, 2018 WL 5962469 (D. Del. Nov. 14, 2018), the court found claims similar to, but more specific than, claim 1 of the '508 patent, ineligible under § 101. There, the claims recited "[a] remote user interface for reading a status of and controlling irrigation equipment including a pivot and at least two end-guns affixed to the pivot." *Id*. at *2. The claimed interface included "a hand-held display," "a processor," "wireless telemetry means for transmitting signals and data between the remote user interface and the irrigation equipment," and "software operable on said processor." *Id*. Unlike here, the claims in *Valmont* contained specific limitations describing the GUIs used to display data about the irrigation equipment, how users input commands, and how those commands were transmitted to the irrigation equipment to control the spray patterns for the irrigation equipment. *Id*. Nevertheless, the court held the claim was "directed to the abstract idea 'of remotely monitoring and controlling irrigation equipment,'" and the "patent

19

functions conventionally" using "a standard computer telecommunication system, processor, and display." *Id*. at *6-7.

The claims of the '508 are even more deficient. As in *Valmont*, the claims recite using a GUI for remotely controlling and monitoring equipment. *See* '508 patent, 7:46-48 (explaining that communication between computational nodes allows for "remote programming, fault monitoring, synchronization"). And, like in *Valmont*, the '508 patent functions conventionally and uses a standard computer telecommunication system, processor, and display. *Id.* at 8:15-29, 14:41-44 (explaining the computation nodes can be made from an Intel Pentium CPU, the communication link can use one of several well-established protocols, and the GUI operates on a "user-supplied computer"). However, the claims of '508 patent contain even less detail than those in *Valmont* and add even less to the abstract idea. While the claims in *Valmont* contained detailed limitations about the data displayed on the GUIs, the specialized shape of the GUIs, and how user commands were received through manipulation of the GUIs, claim 1 of the '508 patent provides no such limitations. Even the most specific claim of the '508 patent (claim 4) merely requires that the GUI allow a user to adjust parameters of the module using sliders. *Compare Valmont*, 2018 WL 5962469 at *1-2 *with* '508 patent at 19:31-20:9. For all of the reasons the claims in *Valmont* were deemed ineligible, the claims of the

'508 patent are ineligible under § 101.  NU's Third Cause of Action should be dismissed.

## B.  NU's Contributory Infringement Claims Rely On Boilerplate Recitations Of The Legal Standard And Should Be Dismissed.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Accordingly, allegations in a complaint which "consist of no more than recitations of the elements of the cause of action" cannot support a claim for contributory infringement.  *IOENGINE, LLC v. PayPal Holdings, Inc.*, No. CV 18-452-WCB, 2019 WL 330515, at *6-7 (D. Del. Jan. 25, 2019) (Bryson, J.).  When allegations of contributory infringement are asserted with generality, it becomes "impossible 'to determine whether [the plaintiff's] claims of contributory infringement were in fact plausible.'"  *Id*. (quoting *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012)).

Here, NU's claim of contributory infringement does nothing more than recite the legal standard and should be dismissed.  For each of the Asserted Patents, NU alleges contributory infringement under 35 U.S.C. § 271(c).  D.I. 1 ¶¶ 64, 87, 108. In each case, however, NU only makes a conclusory allegation that:

> The Universal Robots Defendants offered to sell and have sold in the United States, and imported into the United States, the Accused Products, which are a material part of the invention of the ['336, '317, '508] patent. The Universal Robots Defendants know that the Accused Products are especially made or especially adapted for an infringing use, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

NU has not alleged how the products sold by Universal Robots constitute "a **component** of a patented machine, manufacture, combination or composition" as required by § 271(c). Instead, NU has alleged that ***Universal Robots' products themselves*** constitute the patented invention. In such cases, judges in this District have dismissed the claims of contributory infringement as no more than "meaningless additional boilerplate." *See Malvern Panalytical, Inc. v. TA Instruments-Waters*, LLC, No. CV 19-2157-RGA, 2020 WL 8225650, at *1 (D. Del. May 5, 2020); *accord Tonal Sys., Inc. v. Icon Health & Fitness, Inc.*, No. CV 20-1197-LPS, 2021 WL 1785072, at *5 (D. Del. May 5, 2021) (recommending dismissal of contributory infringement claim where complaint alleged product itself was infringing).

NU's boilerplate claims for contributory infringement should be dismissed.

### C.     NU Has Not Pled Compliance With The Marking Requirement In § 287(a) Of The Patent Act.

NU has not pled compliance with the marking requirement of 35 U.S.C. § 287(a), which requires that any patented article made, offered for sale, or sold within the United States or imported into the United States be "marked" to give

notice to the public that the product is patented.  "The patentee bears the burden of pleading and proving he complied with § 287(a)'s marking requirement." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350 (Fed. Cir. 2017). Compliance must be pled even where the patentee asserts that there is no evidence that any product needed to be marked. *Express Mobile, Inc. v. Liquid Web, LLC*, No. 18-1177-RGA, 2019 WL 1596999, at *2 (D. Del. 2019); *Horatio Washington Depot Techs. LLC v. TOLMAR, Inc.*, No. CV 17-1086-LPS, 2018 WL 5669168, at *15 (D. Del. Nov. 1, 2018)), *order corrected*, 2018 WL 6168617 (D. Del. Nov. 26, 2018), *and report and recommendation adopted*, No. CV 17-1086-LPS-CJB, 2019 WL 1276028 (D. Del. Mar. 20, 2019).

NU has not pled compliance with § 287(a), and its claims for past damages should be dismissed. *See Express Mobile*, 2019 WL 1596999, at *2 (granting motion to dismiss as "[a] claim for past damages requires pleading compliance with the marking statute—even when compliance is achieved, factually, by doing nothing at all.").

## V.   CONCLUSION

For the reasons set forth above, NU's claims of patent infringement should be dismissed.

*Of Counsel:*

Vinita Ferrera
James M. Lyons
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Christopher R. Noyes
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

Dated:  May 27, 2021

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

*Counsel for Defendants Universal
Robots A/S and Universal Robots
USA, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE REQUIREMENT
## AND TYPE-VOLUME LIMITATION

I hereby certify on this 27th day of May, 2021:

1.      This brief complies with the applicable type-volume limitation because

it contains 4,993 words, which were counted by Microsoft Word.


*/s/ Christine D. Haynes*
Christine D. Haynes (#4697)
haynes@rlf.com